UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16-cr-161 (MJD/LIB) (1) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Miguel Rios-Quintero (1), | |
| Defendant. | |
| | |
| UNITED STATES OF AMERICA, | No. 16-cr-161 (MJD/LIB) (3) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Erivan Argenix Gomez (3), | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Miguel Rios-Quintero's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 78], upon Defendant Erivan Argenix Gomez's Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure, [Docket No. 70], and upon Defendant Erivan Argenix Gomez's Motion for Severance of Defendants, [Docket No. 65]. The Court held a motions hearing on July 28, 2016, regarding the parties' pretrial motions.[1] The parties requested an opportunity to submit supplemental briefing which was completed and the motions were then taken under advisement on August 30, 2016.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Orders. [Docket Nos. 100, 101].

For reasons discussed herein, the Court recommends that Defendant Rios-Quintero's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 78], be **DENIED**; Defendant Gomez's Motion to Suppress Evidence Acquired by Means of Illegal Search and Search, [Docket No. 70], be **DENIED**; and that Defendant Gomez's Motion for Severance of Defendants, [Docket No. 65], be **DENIED without prejudice**.

## I.   BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant Rios-Quintero and Defendant Gomez (collectively "Defendants") are each charged with one (1) count of conspiracy to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841 (a)(1); 841 (b)(1)(C); and 846. (Indictment [Docket No. 1]).

### B.  Facts[2]

In the early afternoon of March 8, 2016, Police Officer Daniel Seaberg[3] ("Officer Seaberg") received a telephone call from Special Agent Groth ("SA Groth") and Special Agent Mackenhausen[4] ("SA Mackenhausen") informing Officer Seaberg that SA Groth and SA Mackenhausen had received information about persons possessing controlled substances, and that they were in the process of drafting a search warrant. (July 28, 2016, Motions Hearing, Digital Recording at 2:11–2:13 p.m.). SA Groth and SA Mackenhausen asked Officer Seaberg to sit surveillance on the residence of Hannah Dalton in Cass Lake. (Id.). Specifically, they asked Officer Seaberg to surveil a black Buick Rendezvous that was parked in the driveway of that

---

[2] These facts are derived from the testimony of City of Bemidji Police Officer Daniel Seaberg and Red Lake Criminal Investigator Collin Brunelle at the July 28, 2016, motions hearing.

[3] Officer Seaberg is employed by the City of Bemidji Police Department, and he is currently assigned as a task force officer for the Paul Bunyan Drug Task Force Officer in the FBI Safe Trails Task Force. As a member of that Task Force Officer Seaberg regularly works with officers from other agencies. (Id. at 2:10–2:11 p.m.).

[4] Officer Seaberg testified that Special Agent Groth and Special Agent Mackenhausen are officers at the Leech Lake Indian Reservation Police Department who are also assigned to the Paul Bunyan Drug Task Force.

residence and to let them know if it left the residence. (Id. at 2:13–2:14 p.m.). Officer Seaberg was previously aware of Hannah Dalton as a known drug trafficker in the area of Cass Lake and Bemidji. (Id. at 2:13–2:15 p.m.). Officer Seaberg was further informed that some Hispanic males had arrived at the residence in a black Rendezvous, and that the officers were going to execute a search warrant on the Dalton residence once the search warrant was acquired. (Id. at 2:13–2:14 p.m.). Officer Seaberg agreed to help with the surveillance, and he went to the residence in Cass Lake along with Special Agent John Rogers who was his passenger. (Id. at 2:13–2:16 p.m.).

Before Officer Seaberg's eventual mobile surveillance began, SA Mackenhausen informed Officer Seaberg of the reasons for the surveillance: an individual had contacted SA Mackenhausen and SA Groth to inform them that there were Hispanic males at the Dalton residence driving a black Rendezvous with a large amount of methamphetamine. (Id. at 2:59–3:01 p.m.; 3:05–3:07 p.m.).

Upon arriving at the Dalton residence, Officer Seaberg observed that the black Rendezvous was no longer there; however, he was quickly thereafter informed that the Rendezvous had moved to the residence of Will Reed, and he was instructed by SA Mackenhausen to go to that residence to surveil the black Rendezvous. (Id. at 2:15–2:17 p.m.). Will Reed was also known to Officer Seaberg to be an area drug trafficker. (Id. at 2:15–2:18 p.m.).

Once at the Reed residence, Officer Seaberg observed that a black Rendezvous was parked parallel with First Street inside the residence's driveway. (Id. at 2:14–2:15 p.m.).[5] Upon

---

[5] During his testimony at the motions hearing, Officer Seaberg drew a diagram containing the Reed residence, the adjoining roads, the locations of each vehicle, and the location from which the officers observed the residence. The Government, without objection, offered that diagram as Government's Exhibit 1.

driving past the Reed residence, Officer Seaberg also observed a red Kia[6] pointing south parked next to a van facing the same direction. (Id. at 2:19–2:25 p.m.). He also observed the black Rendezvous—parked behind and perpendicular to the other cars—facing east, with the engine running. (Id.). Officer Seaberg verified it was the same black Rendezvous by matching its license plate number to the license plate number he had been given by SA Mackenhausen. (Id. at 2:24–2:25 p.m.).

After driving by the residence, Officer Seaberg and SA Rogers parked at a Teals Market northwest of the residence approximately 150 yards away. (Id. at 2:24–2:25 p.m.; 2:52–2:53 p.m.). From a diagonal angle, the officers had a view of the residence through the back window of the car. (Id. at 2:26–2:27 p.m.). Officer Seaberg testified that at the time of the surveillance it was light out and there was either a light rain or snow. (Id. at 2:24–2:26 p.m.). The officers continued surveilling the black Rendezvous and the residence for approximately forty (40) minutes. (Id.). During their surveillance, they observed a Native American male drive up to the residence in a red Impala, pick up and then leave with a female who exited the Reed residence. (Id. at 2:25–2:26 p.m.).

Shortly after the red Impala pulled away from the residence, four men who may have been Hispanic or Native American—and whom Officer Seaberg did not recognize—exited the Reed residence; followed by the red Impala pulling back up to the residence where the female exited the Impala. (Id. at 2:26–2:27 p.m.). Officer Seaberg did not observe the males carrying any packages. (Id. at 2:49–2:50 p.m.). Two of the four males went to the black Rendezvous, and the other two males went out of sight behind the parked van to where the red Kia was parked. (Id. at 2:26–2:28 p.m.).

---

[6] While Officer Seaberg referred to the Kia as marron and others referred to the Kia as red, no party challenges the fact that it was the same Kia.

The red Kia then backed out of the driveway and drove west on Fourth Avenue towards the observing officers. (Id. at 2:27–2:28 p.m.). The black Rendezvous completed a U-turn and began following immediately behind the red Kia. (Id.). The officers observed both vehicles head northbound on Highway 371, and the officers proceeded to follow the vehicles northbound on Highway 371 leaving approximately one block between the officers and the two target vehicles. (Id. at 2:27–2:30 p.m.).

The black Rendezvous remained behind the red Kia. (Id. at 2:30–2:31 p.m.). From approximately one block's distance, and with no cars between the officers and the black Rendezvous, Officer Seaberg observed that the black Rendezvous had a brake light out on the driver's side of the vehicle. (Id. at 2:29–2:31 p.m.).

The target vehicles then turned onto Highway 2 towards Bemidji which prompted Officer Seaberg to call his partner Special Agent Kleszyk ("SA Kleszyk") to request assistance in the ongoing mobile surveillance. (Id. at 2:30–2:33 p.m.). Officer Seaberg also contacted SA Mackenhausen to update him on the situation and to ensure he still wanted Officer Seaberg to follow the black Rendezvous; which SA Mackenhausen affirmatively verified. (Id. at 2:30–2:32 p.m.). After being stopped by a traffic signal, Officer Seaberg increased his speed to catch back up to the red Kia and the black Rendezvous, and upon approaching the vehicles, he reduced his speed to sixty-two or sixty-three miles per hour in order to maintain a distance of approximately one hundred yards. (Id. at 2:31–2:33 p.m.). From that distance, Officer Seaberg observed that the vehicles were continuing to travel in tandem with the black Rendezvous maintaining three or four car lengths behind the red Kia. (Id.). The black Rendezvous stayed behind the red Kia at all times. (Id. at 2:32–2:33 p.m.).

As the target vehicles proceeded along Highway 2, SA Kleszyk joined Officer Seaberg in following the vehicles. (Id. at 2:33–2:34 p.m.). When SA Kleszyk joined the mobile surveillance, Officer Seaberg passed the red Kia and the black Rendezvous on the driver's side in an attempt to see who was operating the vehicles. (Id.). Officer Seaberg observed that the black Rendezvous was being driven by a Hispanic male. (Id. at 2:33–2:35 p.m.). Officer Seaberg also observed two Hispanic males in the red Kia, and he observed that both of the target vehicles continued to maintain three or four car lengths between one another. (Id. at 2:34–2:36 p.m.).

Officer Seaberg then contacted special agents at the Bureau of Criminal Apprehension ("BCA") to assist in the ongoing mobile surveillance, and Officer Seaberg, after exiting Highway 2 and then returning, again joined SA Kleszyk in the mobile surveillance behind the vehicles near Bemidji. (Id. at 2:35–2:37 p.m.). At that time, a total of four law enforcement vehicles were assisting in the mobile surveillance. (Id. at 2:36–2:39 p.m.). The red Kia and black Rendezvous maintained their tandem positioning as they then proceeded into and through Bemidji; eventually taking an off ramp to proceed northbound on Irvine Avenue, which is also known as County Road 15 or Highway 15. (Id. at 2:36–2:38 p.m.). When the subject vehicles left Bemidji going north on Irvine Avenue, the officers involved in the mobile surveillance contacted Red Lake tribal police as the officers involved in the mobile surveillance assumed the target vehicles were headed to the Red Lake Indian Reservation. (Id. at 2:37–2:39 p.m.).

The officers assumed the target vehicles were headed to Red Lake Indian Reservation based on their travel route and the information they had received suggesting the possibility that they had controlled substances. (Id.). Based on information provided by SA Groth and SA Makenhausen, Officer Seaberg believed that the subject vehicles were bringing methamphetamine into the Red Lake Indian Reservation area. (Id. at 2:38–2:40 p.m.).

The officers from the various law enforcement agencies were not all able to use the same radio frequency. So in order to relay information, Officer Seaberg was on the radio with SA Kleszyk, who was then on a cell phone with one of the agents from the BCA who was participating in the mobile surveillance, and SA Roger was on a cell phone with officers from Red Lake. (Id. at 2:40–2:41 p.m.). As each new officer was brought into the mobile surveillance, they were informed as to why the mobile surveillance was happening, including the suspicions of drug activity headed toward the Red Lake Indian Reservation, and they continued to be informed about what was happening in the mobile surveillance itself. (Id. at 2:41–2:42 p.m.).

Officer Seaberg continued as part of the mobile surveillance until just north of the Buena Vista ski area, which is approximately ten miles from the Red Lake Indian Reservation. (Id.). Officer Seaberg left the mobile surveillance at that time when he was contacted by SA Groth who informed him that officers needed assistance in executing the recently signed search warrant for the Hannah Dalton residence back in Cass Lake. (Id. at 2:42–2:43 p.m.). Officer Seaberg estimated that twenty to thirty minutes had passed from the initiation of mobile surveillance leaving out of Cass Lake to the time Officer Seaberg left the mobile surveillance. (Id. at 2:47–2:48 p.m.).

Officer Seaberg testified that the entire time he surveilled the two target vehicles they remained in the tandem position with the black Rendezvous three or four car lengths behind the red Kia. (Id. at 2:42–2:44 p.m.). Officer Seaberg also testified that during the duration of this mobile surveillance, he saw the rear brake light of the black Rendezvous not work multiple times. (Id. at 2:39–2:40 p.m.). Shortly after Officer Seaberg left the mobile surveillance, SA Kleszyk also left the surveillance leaving Special Agent Don Newhouse ("SA Newhouse") and SA Fraik—in two separate cars—surveilling the red Kia and the black Rendezvous. (Id.). At all

times during mobile surveillance, at least one of the law enforcement officers maintained visual contact with the red Kia and the black Rendezvous. (Id. at 2:43–2:45 p.m.).

At some point during the continued mobile surveillance of the red Kia and the black Rendezvous, SA Newhouse called Red Lake Criminal Investigator Collin Brunelle ("CI Brunelle") to inform him they were conducting mobile surveillance on two target vehicles which they believed were headed to the Red Lake Indian Reservation, told CI Brunelle their then-current location, gave him a description of the vehicles, and informed CI Brunelle that they believed there to be methamphetamine in the vehicles, and a possible weapon. (Id. at 3:29–3:31 p.m.).[7] Although the cellular service was sporadic, SA Newhouse was able to give CI Brunelle the target vehicles' license plate numbers, describe the vehicles to CI Brunelle as a red Kia and a dark colored Rendezvous, and inform CI Brunelle that the vehicles were travelling north on County Road 15 towards the Red Lake Indian Reservation. (Id. at 3:30–3:33 p.m.).[8]

Upon receiving the information that the vehicles were headed toward the reservation, CI Brunelle asked Red Lake Chief Conservation Officer Pat Graves ("CCO Graves") to accompany him in intercepting the vehicles. (Id. at 3:32–3:34 p.m.). They also informed Red Lake Officer Ron Leyba ("Officer Leyba") who followed them. (Id.).

CI Brunelle and CCO Graves—in CI Brunelle's unmarked truck—headed to intercept the vehicle upon their entry on to the Red Lake Indian Reservation while Officer Leyba and Officer

---

[7] At the motions hearing, there was no testimony as to where SA Newhouse was provided with the information about a possible firearm, but it is reasonable to conclude it came from the exchange of information among the officers during the mobile surveillance and pursuit of the red Kia and black Rendezvous. The Court notes that there is reference to information provided by a cooperating witness in a search warrant application Officer Seaberg prepared regarding a search of the Reed residence in Cass Lake, (see Defendant's Exhibit1 at p. 1-3), and Officer Seaberg testified that this was information obtained by SA Groth regarding the Dalton residence in Cass Lake, (July 28, 2016, Motions Hearing, Digital Recording at 2:53–2:57 p.m.; 3:02–3:05 p m.), which initiated the surveillance and pursuit of the red Kia and black Rendezvous in the first instance.

[8] While Officer Seaberg testified that the vehicle were headed north on Irvine Avenue, CI Brunelle referred to the road as County Highway 15. CI Brunelle clarified that the two roads were the same road referred to by different names. (Id. at 3:31–3:32 p.m.).

Keary Petschl followed behind in Officer Leyba's patrol car, and additional units followed behind Officer Leyba. (Id. at 3:34–3:35 p.m.). By the time CI Brunelle reached County Highway 15, SA Newhouse had informed him that the target vehicles were travelling in tandem with the red Kia in front and the black Rendezvous in back; that the black Rendezvous had a brake light out on the rear driver's side; that both vehicles had two occupants; and that there was the possibility of methamphetamine in the vehicles along with a possible weapon. (Id. at 3:37–3:39 p.m.; 4:24–4:27 p.m.). SA Newhouse did not provide CI Brunelle with the basis of that information, but CI Brunelle testified that he trusted SA Newhouse because they had previously worked cases together over the past nine years in which they had shared case information. (Id. at 3:38–3:40 p.m.; 3:56–3:58 p.m.).

After turning onto County Road 15, but while still on the Red Lake Reservation, CI Brunelle encountered the red Kia and the black Rendezvous travelling in tandem with the Kia in front followed by the Rendezvous approximately three car lengths behind the Kia. (Id. at 3:39–3:41 p.m.). Upon encountering the vehicles, CI Brunelle pulled off of the road, activated his lights, and began a U-turn to stop the vehicles. (Id. at 3:41–3:42 p.m.).

CI Brunelle testified that he was stopping the vehicles based on the information that was given to him by SA Newhouse and the fact that the black Rendezvous had a rear brake light out which CI Brunelle observed himself when the Rendezvous pulled off the road. (Id. at 3:41–3:43 p.m.). As he initiated the stop, the black Rendezvous pulled over to the side of the road, but the red Kia sped away. (Id.). CI Brunelle pulled behind the Rendezvous, and he instructed Officer Leyba to pursue the Kia. (Id. at 3:43–3:45 p.m.).

Upon stopping the Rendezvous, CI Brunelle and CCO Graves exited their vehicle. (Id. at 3:44–3:45 p.m.). CI Brunelle, with his gun in the "low and ready position,"[9] asked the driver of the Rendezvous to shut off the vehicle and to place both his hands and keys outside the window. (Id. at 3:44–3:46 p.m.). The driver complied. (Id.). CI Brunelle then had the driver get out and walk backwards toward CI Brunelle who then handcuffed the driver as a matter of safety. (Id.). CI Brunelle noted that the driver was handcuffed for both his safety and the safety of the officers, in part, based on the information he had been provided of possible possession of a gun in the transportation of methamphetamine. (Id. at 3:44–3:46 p.m.; 4:05–4:06 p.m.). CCO Graves then repeated that procedure for the passenger of the Rendezvous. (Id. at 3:44–3:46 p.m.). At least three law enforcement vehicles were at the stopped Rendezvous, CI Brunelle could not recall the exact number of vehicles or the exact number of officers, he did not see if the other officers behind him had their firearms drawn, but he assumed they probably did. (Id. at 4:06–4:08 p.m.). While the driver and passenger of the Rendezvous were being secured, CI Brunelle could hear over his car radio what was going on in the pursuit of the fleeing red Kia. (Id. at 3:46–3:47 p.m.).

CI Brunelle heard Officer Leyba broadcast that as he was beginning to pull over the Kia, he could see that the Kia's passenger door was open, and he stated that he thought someone was going to run from the Kia. (Id. at 3:47–3:48 p.m.). An individual did in fact flee the Kia, however, he was pursued and detained by Officer Petschl. (Id. at 3:47–3:49 p.m.). CI Brunelle estimated that no more than three to five minutes passed between the time CI Brunelle stopped the Rendezvous and detained the occupants, and the time Officer Petschl apprehended the individual who had run from the red Kia. (Id. at 3:48–3:49 p.m.).

---

[9] CI Brunelle described the "low and ready position" as having his firearm out of its holster pointed down with both hands on the firearm. (Id. at 3:45–3:46 p.m.). CI Brunelle testified that it was common practice to have his weapon drawn when he effectuates a stop where there are narcotics and a possible weapon involved. (Id.). CI Brunelle noted that he had his window down so he could hear his radio, as he did not carry a radio on his person, and because he considered the stop to be what he referred to as a "felony stop." (Id. at 3:43–3:44 p.m.).

During the time CI Brunelle could hear the communications related to the stop of the red Kia over his truck radio, he and CCO Graves detained the Defendants, patted down the Defendants, removed their property from their pockets, took pictures of the passenger for identification, and walked by the black Rendezvous to ensure that no other occupants were hiding inside the vehicle. (Id. at 3:49–3:50 p.m.; 3:51–3:53 p.m.). CI Brunelle was able to identify the driver as Defendant Gomez, and after sending pictures of the passenger to a colleague for identification, he was able to identify the passenger as Defendant Rios-Quintero. (Id. at 3:46–3:47 p.m.). CI Brunelle testified that, as he was attempting to identify the passenger at the traffic stop, the detention of the vehicle occupants turned to an arrest when CI Brunelle learned from CCO Graves that the other Red Lake officers had found a large amount of what they believed to be methamphetamine up ahead at the stop of the Kia. (Id. at 3:53–3:55 p.m.; 4:27–4:29 p.m.).

On the record at the motions hearing, CI Brunelle was able to identify the driver of the Rendezvous as Defendant Gomez and the passenger as Defendant Rios-Quintero. (Id. at 3:49–3:51 p.m.).

After the occupants of the Rendezvous were arrested and placed in separate patrol units, CI Brunelle went back to the black Rendezvous looking for the possible gun. (Id. at 3:54–3:55 p.m.). Upon cross examination, CI Brunelle reiterated that he did not search the vehicle looking for the gun at the same time he previously walked by the vehicle to check to ensure no other occupants were hiding inside the vehicle; he only searched the vehicle after the occupants had been arrested. (Id. at 4:10–4:15 p.m.; 4:20–4:23 p.m.). Inside the armrest compartment[10] of the

---

[10] CI Brunelle clarified at the motions hearing that while his report referred to the cash location as a simple armrest it was, in fact, an armrest with a compartment for storage. (Id. at 3:58–4:00 p.m.; 4:23–4:25 p.m.). At the motions hearing, Defendants cross examined CI Brunelle on his written report not reflecting any time passing between the search for individuals and the search of the armrest console. CI Brunelle asserted that while that may have been the

black Rendezvous, CI Brunelle discovered two large rolls of cash which he placed on the passenger seat as he continued to look for the possible gun of which he had previously been informed. (Id. at 3:54–3:55 p.m.). After searching in the passenger and driver's seat area without locating a weapon, CI Brunelle "backed off" the search. (Id.). The Rendezvous was then towed for evidence to the BCA office. (Id. at 3:54–3:56 p.m.). The cash found in the Rendezvous and the cell phones found on the persons of the Rendezvous' occupants were given to FBI Agent Mark Myers. (Id. at 3:55–3:56 p.m.).

## II.      DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE. [DOCKET NOS. 70, 78].

Defendants both move the Court for an order suppressing any evidence obtained as a result of the search of the black Buick Rendezvous on March 8, 2016. (Defs.' Mots. to Suppress [Docket Nos. 70, 78]).[11] While both Defendants seek suppression of all evidence obtained as a result of the search of the Rendezvous, including the rolls of cash, Defendant Gomez also specifically seeks to suppress—as fruit of an allegedly illegal search of the Rendezvous—his statement provided to law enforcement after his arrest and his cellular telephone taken from his person after his arrest.

Defendants, however, no longer challenge the initial stop of the Rendezvous by CI Brunelle. (See Def. Gomez's Mem., [Docket No. 112], at 9; Def. Rios-Quintero's Mem. [Docket No. 116]).

---

way he drafted the report, his testimony was the way in which the events transpired. (See Id. at 4:11–4:15 p.m.; 4:20–4:24 p.m.). CI Brunelle's report to which Defendants' counsel referred was not presented into evidence at the motions hearing.

[11] In his initial motion, Defendant Gomez challenged the stop of the Maroon Kia on March 8, 2016. However, at the motions hearing, Defendant Gomez withdrew the portion of his motion related to the Maroon Kia, and he acknowledged that his motion now only seeks to suppress evidence found as a result of the search of the black Buick Rendezvous. (July 28, 2016, Motions Hearing, Digital Recording at 2:06–2:06 p.m.).

**A.  Standard of Review**

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663).

**B.  Analysis**

As noted, Defendants no longer challenge the initial stop of the Rendezvous. As Defendant Gomez acknowledges in his memorandum, in the Eighth Circuit, any traffic violation, no matter how minor, will provide probable cause to justify a traffic stop. See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008).

Defendants, however, still challenge the search inside of the black Rendezvous on a number of grounds. Defendant Gomez argues that the results of the search should be suppressed due to the allegedly overwhelming show of police force at the initial stop which resulted in a de facto arrest of Defendants without probable cause, and alternatively he argues that if the Court determines that a de facto arrest did not occur at the initial stop and instead that Defendants were later arrested upon probable cause, the evidence from the search should still be suppress because the facts in the present case, according to Defendants, demonstrate that CI Brunelle searched for and found the rolls of cash before he had probable cause to search the vehicle or arrest Defendants. (Def. Gomez's Mem. [Docket No. 112]). Defendant Rios-Quintero argues that the results of the search should be suppressed as the search occurred without a warrant and without

an applicable warrant exception, reasoning that CI Brunelle did not possess the requisite probably cause to search the vehicle under the automobile exception. Both Defendants focus in large part on the information initially given to SA Groth by a cooperating individual. Neither Defendant argues that CI Brunelle lacked probable cause to arrest Defendants once he learned that Red Lake officers had discovered large quantities of suspected methamphetamine at the stop of the Kia which had been observed at all times to be associated with and travelling in tandem with the black Rendezvous.

1. De facto arrest

Defendant Gomez contends that, even if the initial stop was lawful, it became unlawful when Defendants were immediately placed under de facto arrest—due to the allegedly overwhelming show of police force at the initiation of the stop—without probable cause. In support, Defendant Gomez relies, in large part, on United States v. Hill, 91 F.3d 1064 (8th Cir. 1996).

In Hill, the defendant claimed he was placed under de facto arrest after the vehicle in which he was travelling was impounded, with five police cars present, and he was transported in a squad car to the vehicle driver's residence. Id. at 1069–70. The Hill court noted that a "de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop." Id. at 1070. In determining the necessity of the intrusiveness of the stop, the Hill court provided that courts "must consider such factors as the duration of a stop, whether the suspect was handcuffed or confined in a police car, whether the suspect was transported or isolated, and the degree of fear and humiliation that the police conduct engenders." Id. (internal quotations omitted). Upon weighing the factors, the Hill court determined that the defendant there had not been placed under de facto arrest reasoning that no officer had brandished a weapon or attempted

to intimidate him, and that Hill's transportation in a police car was to a residence and necessary in light of the vehicle being impounded. Id. The court also specifically noted that the stop lasted no longer than was necessary to search the vehicle, and when the center console proved inaccessible, to impound it. Id.

Defendant Gomez argues that in the present case the Defendants were placed under de fact arrest due to a number of factors, including (1) at least three law enforcement vehicles were at the site when the Rendezvous was stopped; (2) CI Brunelle, and possibly other officers, had their firearms drawn in the low and ready position when CI Brunelle first approached the Rendezvous causing Defendants fear and humiliation; (3) Defendants were handcuffed; (4) Defendants were subjected to a pat down search which result in the removal of their property from their pockets; and (5) CI Brunelle intended to arrest Defendants from the very beginning. The Court disagrees.

The circumstances surrounding the stop of the Rendezvous fail to establish that Defendants were placed under de facto arrest. The factors highlighted by Defendant Gomez ignore the fact that CI Brunelle had been provided information by another officer that there was a suspicion that there may have been of a gun inside one of the vehicles. See United States v. Robinson, 119 F.3d 663, 666–67 (8th Cir. 1997) (providing that an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation). At the time that CI Brunelle's service weapon was held in the low and ready position, officer safety was a concern. Also, there is no evidence that the weapons were ever pointed directly at the Defendants.

The mere fact that three law enforcement vehicles were present at the site of the traffic stop involving the Rendezvous also does not indicated the Defendants were placed under de

facto arrest. See Hill, 91 F.3d at 1070 (concluding that a de facto arrest did not occur when there were five police cars at the scene of the vehicle stop).

Further, the fact that Defendants were initially handcuffed and subject to pat down searches does not result in Defendants being placed under de facto arrest. See United States v. Navarrete-Barron, 192 F.3d 786, 790–91 (8th Cir. 1999) (providing that during a Terry stop officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop, including handcuffing defendants as a precaution). For the same reason, CI Brunelle's positioning of his sidearm in the low and ready position was not unreasonable given the fact that he had been informed there may have been a firearm in one of the vehicles. See generally, Id. (finding that officers were justified in using weapons and handcuffs to conduct Terry stop based on reasonable suspicion that suspects were armed).

Lastly, any alleged additional, subjective intent CI Brunelle may have had when initiating the traffic stop on the Rendezvous plays no role in determining whether a de facto arrest occurred. Whren v. United States, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions play no role in Fourth Amendment analysis).

Under these circumstances, the Court concludes that the officers could permissibly approach the car with weapons drawn at the low and ready position and initially handcuff the occupants without transforming the admittedly lawful traffic stop into a de facto arrest.

2. When the Interior Search of the Rendezvous Occurred

Defendants argue that CI Brunelle searched the inside of the Rendezvous and discovered the rolls of cash at the same time he first looked into the vehicle to see if any other occupants were hiding inside and before he was aware drugs had been located in the Kia. In support of this

argument, Defendants refer to CI Brunelle's written report. Defendants argue that the sentence in his written report stating that CI Brunelle looked into the car to check for additional occupants is directly followed by the sentence that he found the rolls of cash in the armrest.[12] The Defendants infer from this that there must have been no intervening period between the two actions.

However, at the motions hearing, CI Brunelle testified and clarified that he did not find the rolls of cash at the time he first looked into the Rendezvous for other possible occupants inside. CI Brunelle testified that when he initially stopped the vehicle and handcuffed the occupants, he only walked by the vehicle for officer safety to ensure no other occupants were hiding inside the vehicle. (July 28, 2016, Motions Hearing, Digital Recording at 3:48–3:50 p.m.; 4:10–4:14 p.m.; 4:20–4:23 p.m.). CI Brunelle testified that while the Kia was being stopped and the individual fleeing from that car was being caught, he was patting down both Defendants and attempting to identify the Defendants, which required time to take a picture of Defendant Rios-Quintero and send it off-site as Defendant Rios-Quintero did not then have any form of identification. (Id. at 3:50–3:53 p.m.). He testified that he only searched the Rendezvous after he learned that the Red Lake officers who had stopped the fleeing Kia had found a large amount of suspected methamphetamine. (Id. at 3:54–3:55 p.m.; 4:10–4:14 p.m.; 4:20–4:23 p.m.). It was also after CI Brunelle had received this information regarding the discovery of drugs that he also placed Defendants under arrest, placed them into separate patrol units, and then searched the Rendezvous. (Id. at 3:53–3:55 p.m.).

On the basis of the full record at the motions hearing, the Court credits CI Brunelle's testimony regarding the timeline of events surrounding the search of the Rendezvous. CI Brunelle was shown his written report upon cross examination and, upon repeated questioning by

---

[12] CI Brunelle's report was not offered into evidence. Therefore, the Court does not have that report to consider the two sentences highlighted by Defendants in context of CI Brunelle's entire written report.

Defense counsel, he reiterated that, while he did not include his intervening activities in his report, he only searched the Rendezvous and discovered the rolls of cash <u>after</u> he learned that officers at the Kia had discovered large amounts of suspected methamphetamine, and <u>after</u> he had formally placed the Defendants under arrest.

3. The Search of the Rendezvous

The only remaining issue for the Court is whether the search of the Rendezvous itself was constitutional pursuant to the Fourth Amendment.

Defendants concede that the initial traffic stop of the Rendezvous was lawful, (<u>See</u> Def. Gomez's Mem., [Docket No. 112], at 9; Def. Rios-Quintero's Mem. [Docket No. 116]), and the Court has already determined above that a de facto arrest did not occur upon the initiation of the traffic stop. While Defendants argue that the search of the Rendezvous occurred before CI Brunelle learned that Red Lake officers had recovered suspected methamphetamine from the red Kia that had been travelling in tandem with the Rendezvous, Defendants appear to concede that probable cause existed to search the Rendezvous after CI Brunelle learned that large amounts of suspected methamphetamine had been discovered at the Kia. The Court has already found credible CI Brunelle's testimony that he only searched the inside of the Rendezvous <u>after</u> he learned of the large amounts of suspected methamphetamine recovered at the Kia. Defendants do not argue that CI Brunelle unlawful prolonged the traffic stop.

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." <u>United States v. Jones</u>, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few

specifically and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. Unites States, 389 U.S. 347, 357 (1967)). One of these exceptions is the "automobile exception." United States v. Williams, 616 F.3d 760, 764 (8th Cir. 2012).

"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, we "apply a common sense approach and consider all relevant circumstances." Id. "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

The Court finds, under the totality of the circumstance in the present case, that CI Brunelle had probable cause to search the Rendezvous without a warrant under the automobile exception as he reasonably suspected the vehicle could contain contraband or evidence of a crime.

SA Mackenhausen and SA Groth had informed Officer Seaberg they had received information about persons possessing controlled substances and specifically asked him to surveil the black Rendezvous presently at issue. Officer Seaberg and other law enforcement officers including SA Newhouse, surveilled the Rendezvous and a red Kia travelling in tandem together

from the Reed residence to the Red Lake reservation. SA Newhouse informed CI Brunelle that the vehicles had been travelling in tandem for some time and that there was a possibility of methamphetamine in the one of vehicles along with a weapon involved in the transportation of that methamphetamine. CI Brunelle personally observed the vehicles travelling in tandem. See United States v. Ocampo, 937 F.2d 485, 490 (9th Cir. 1991) ("We have also recognized that tandem driving, though oftentimes explicable on entirely innocent grounds, may likewise indicate criminal activity."). CI Brunelle observed the red Kia flee when Red Lake officers initiated an admittedly lawful traffic stop. CI Brunelle learned from the officers pursuing that Kia that one of the occupants had fled on foot. Before he searched the Rendezvous, CI Brunelle also learned from CCO Graves that Red Lake officers had discovered a large of amount of suspected methamphetamine at the red Kia. CI Brunelle testified that after he received this information he searched the Rendezvous to look for the possible weapon that had been reported. See Navarrete-Barron, 192 F.3d at 791 (noting that drug trafficking is very often accompanied by dangerous weapons). It was during this search that the rolls of cash were located in the armrest compartment of the Rendezvous.

Based on the totality of the circumstances as they were then known to the officers involved in the pursuit and to CI Brunelle, there was a fair probability that contraband or evidence of a crime could be found in the Rendezvous.

Accordingly, CI Brunelle had probable cause to search the Rendezvous, and pursuant to the automobile exception, CI Brunelle did not need a warrant to search the vehicle. This probable cause allowed CI Brunelle to search inside the armrest compartment. See United States v. Ross, 4556 U.S. 798, 825 (1982) ("If probable cause justified the search of a lawfully stopped vehicle,

it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

4. Defendant Gomez's Additional Arguments

Defendant Gomez also moves the Court to suppress the items removed from his person at the traffic stop and his subsequent statement to law enforcement. The only basis on which Defendant Gomez suggests that those items and that his statement should be suppressed is that they arose as a result of and are therefore tainted as fruits of an allegedly unlawful de facto arrest and unconstitutional subsequent road side search of the Rendezvous on March 8, 2016.

"Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." United States v. Simpson, 439 F.3d 490, 493–94 (8th Cir. 2006) (citing Hamilton v. Nix, 809 F.2d 463, 465 (8th Cir. 1987)).

As Defendant Gomez no longer challenges the initial traffic stop of the Rendezvous, because the Court has already concluded that no de facto arrest occurred, and because the search of the Rendezvous was based on probable cause and the automobile exception to the Fourth Amendment of the Constitution, Defendant Gomez's argument that the items recovered and his statement should be suppressed as fruit of the poisonous tree necessarily fails.

Therefore, on the basis of the totality of the evidence and for the foregoing reasons, the Court recommends **DENYING** Defendant Gomez's Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure, [Docket No. 70], and **DENYING** Defendant Rios-Quintero's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment. [Docket No. 78].

III.   **DEFENDANT GOMEZ'S MOTION TO SEVER DEFENDANTS. [DOCKET NO. 65].**

Defendant Gomez also moves this Court for an order directing severance of Defendants as to himself. (Def. Gomez's Mot. to Sever Defs. [Docket No. 65]).

A. **Standard of Review**

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (internal quotation and citation omitted). "[R]arely, if ever, will it be improper for co-conspirator to be tried together." Id. (citing United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995)).

The Federal Rules of Criminal Procedure also provide that if joinder creates prejudice to either the Government or a defendant, the Court may sever a trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11–230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25–26 (D. Minn. Oct. 5, 2011) (citing Warfield, 97 F.3d at 1019). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[ ] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209–10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial

enough to outweigh the general efficiency of joinder." <u>Clay</u>, 579 F.3d at 927 (citing <u>United States v. Al–Esawi</u>, 560 F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." <u>United States v. Mickelson</u>, 378 F.3d 810, 818 (8th Cir. 2004).

### B.  Analysis

Defendant Gomez moves the Court for an order, pursuant to Federal Rules of Criminal Procedure 8 and 14, severing his case from that of all the other Defendants in the present case. (Def. Gomez's Mot. to Sever Defs. [Docket No. 65]).

Defendant Gomez's Motion for Severance of Defendants, [Docket No. 65], is conclusory and articulates no specific facts demonstrating either (1) that joinder of the defendants was improper under Rule 8(b), or (2) that continued joinder will create prejudice sufficient to warrant severance pursuant to Rule 14.

Defendant merely argues generally that severance is proper on the grounds that:

1. The evidence to be presented at trial is such that the jury will be unable to compartmentalize the evidence against the defendant, causing an improper transference of guilt.
2. Evidence which would be inadmissible were the counts against the defendants tried separately may be admitted and considered by the jury to the prejudice of the defendant.
3. Exculpatory evidence, directly and exclusively within the knowledge of the co-defendants, is denied Mr. Oatman [sic] because he has no right to call a co-defendant to the stand in a joint trial.
4. Any statements by co-defendant inculpating Mr. Oatman [sic] raises a *Bruton* issue and redacting those statements will not remedy the possible right of confrontation violation that may occur if the statements are introduced.

(Def.'s Mot. for Severance of Defs. [Docket No. 65]).

The Defendant has offered no specific facts to support any of the foregoing general assertions. (<u>See</u> <u>Id.</u>). Defendant's motion as submitted on the present record is insufficient to

sustain his heavy burden to demonstrate that severance is warranted. The Court could summarily recommend denying Defendant's motion on this basis alone. However, in an abundance of caution, the Court notes that in addition to the fact that Defendant has failed to sustain his burden, the underlying alleged facts relevant to the present case indicate that joinder was indeed proper under Rule 8(b) and that severance pursuant to Rule 14 is not warranted on the present record.

The underlying alleged facts articulated in support of the Indictment indicate that the Defendants participated in the same series of acts or transactions constituting offenses. See Fed. R. Civ. P. 8(b). The facts as set forth in the Indictment indicate that the Defendants acting together conspired with others to possess with intent to distribute a substance containing, detectable amounts of methamphetamine. (Indictment [Docket No. 1]). Accordingly, under Rule 8(b), joinder of the Defendants was proper as "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses[,]" and it is not necessary that each Defendant have participated in each offense. Warfield, 97 F.3d at 1019 (citing Fed. R. Crim. P. 8).

Because joinder of the Defendants was proper under Rule 8(b), Defendant necessarily bears the heavy burden of demonstrating that a joint trial will impermissibly infringe on his right to a fair trial. Nothing in the present record before the Court indicates that Defendant stands to incur any specific prejudice attributable to joinder of the Defendants sufficient to warrant severance.

In Bruton v. United States, 391 U.S. 123, 124 (1968), the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner. Id. at n.1. The trial

court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n. 2. The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n. 10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected the suggestion that the rule in Bruton extend to confessions that are incriminating by connection as both impractical and unnecessary. Id. at 208–09.

In the present case, Defendant has not supported his motion by identifying any specific incriminating co-defendant statements that he believes would, if introduced at trial, prejudice

him. Moreover, Defendant has not articulated any specific reason why the jury would be unable to compartmentalize any redacted statements or evidence upon being given proper instruction by the Trial Judge to do so. (See, gen., Def.'s Mot. for Severance of Defs. [Docket No. 65]).

As articulated above, there is a strong preference in the federal system for joint trials. In light of that preference, and at this early juncture, where Defendant can only invite the Court to speculate as to what evidence the Government might actually seek to introduce at a joint trial, severance is not, at this time, appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." United State v. Billups, No. 06-cr-129 (PJS/AJB), F. Supp. 2d 697, 706 (D. Minn. 2006).

As such, for the reasons articulated above, the Court recommends that Defendant Gomez's Motion for Severance of Defendants, [Docket No. 65], be **DENIED** without prejudice.

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1.  That Defendant Gomez's Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure, [Docket No. 70], be **DENIED**;

2.  That Defendant Rios-Quintero's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 78], be **DENIED**; and

3.  That Defendant Gomez's Motion for Severance of Defendants, [Docket No. 65], be **DENIED without prejudice**.

Dated: September 8, 2016                         **s/ Leo I. Brisbois**
                                                 Leo I. Brisbois
                                                 U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.